IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
UNITED STATES OF AMERICA    )
                            )    CRIMINAL ACTION NO.
     v.                     )       2:24cr305-MHT
                            )          (WO)
TAMETRIA CONNER DANTZLER    )
```

OPINION

Defendant Tametria Conner Dantzler pleaded guilty to
a two-count information, one count charging wire fraud
in violation of 18 U.S.C. § 1343 and the other charging
money laundering in violation of 18 U.S.C. § 1957.  Her
Sentencing Guidelines incarceration range is 57 to 71
months.  Dantzler moved for a downward variance to a
sentence of probation, based primarily on the impact her
incarceration and the attendant loss of caregiving would
have on her four children, who range in age from one to
11.  Two have been diagnosed with autism and a third with
a developmental disability, and Dantzler is the primary
caregiver for all four.  The government opposes the
motion.  Dantzer's sentencing was suspended so that the

parties could file briefs addressing the evidence presented on the motion at the sentencing and so that the court could then deliberate on the motion.

For the following reasons, the court will vary downward, but finds that a sentence of probation with no incarceration would not be appropriate.

I.

In determining a criminal sentence, district courts generally proceed in three steps. First, they calculate the sentencing range according to the sentencing table promulgated by the United States Sentencing Commission. *See* United States Sentencing Commission, *Guidelines Manual* § 1B1.1(a) (Nov. 2024) (U.S.S.G.). Second, they look to relevant policy statements from the Commission to determine whether the specific characteristics of the offender and the details of the offense warrant a modification to the sentencing range. *See id.* at

2

§ 1B1.1(b). And, third, they independently determine an appropriate sentence in light of the factors set out in 18 U.S.C. § 3553(a). *See id.* at § 1B1.1(c); *see also United States v. Booker*, 543 U.S. 220, 259-60, 125 S.Ct. 738 (2005). At this final step, if the court finds it necessary to impose a sentence "outside the guidelines framework," the sentence is termed a "variance." U.S.S.G. § 1B1.1, cmt. (backg'd.). Adjustments to the sentence made at step two, on the other hand, are referred to as "departures." *Id.* at § 1B1.1, cmt. n.1(F).

Section 3553(a) requires courts to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of that subsection. Those purposes are "the need for the sentence imposed—"

> "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> "(B) to afford adequate deterrence to criminal conduct;

3

"(C) to protect the public from further crimes
of the defendant; and

"(D) to provide the defendant with needed
educational or vocational training, medical
care, or other correctional treatment in the
most effective manner...."

18 U.S.C. § 3553(a)(2). The court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), "the kinds of sentence and the sentencing range" for the offense under the U.S. Sentencing Guidelines, § 3553(a)(4), "any pertinent policy statement" issued by the Sentencing Commission, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

Therefore, the Guidelines are only "one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90, 128 S.Ct. 558 (2007). While Guidelines sentences generally should approximate the § 3553(a) factors, trial courts may, in the course of an individual sentencing, vary at the third step above because "the case at hand falls outside the 'heartland' to which the Commission intends individual Guidelines to apply" or that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations." *Rita v. United States*, 551 U.S. 338, 351, 127 S.Ct. 2456 (2007).

To be sure, a sentencing court has considerable discretion in determining an appropriate sentence, but the sentence must still be reasonable. *See United States v. Irey*, 612 F.3d 1160, 1188-89 (11th Cir. 2010).

## II.

The court now turns to the application of the above principles.

### A.

Dantzler's base offense level is seven, but she received a significant bump in offense level due to the amount of loss to the government and the application of multiple specific offense characteristics. After adjustments for acceptance of responsibility and for having zero criminal history points, her total offense level was 25. As her criminal history category is I, her resulting guideline imprisonment range is 57 to 71 months. This puts her in Zone D of the sentencing table, which requires a sentence of incarceration. *See* U.S.S.G. § 5C1.1(f).

Dantzler seeks a variance based principally on the impact her incarceration would have on her children. In

6

evaluating Dantzler's request for a variance, the court
consulted the policy statement issued by the Sentencing
Commission on the appropriate impact of family ties and
responsibilities in sentencing: U.S.S.G. § 5H1.6.  *See
also* 18 U.S.C. § 3553(a)(5).  Although this statement
applies most clearly in the context of departures, the
court found the reasoning behind it pertinent to its
consideration of a variance.  Indeed, the court has often
looked to the Commission's policy statements concerning
departures when considering whether a variance is
appropriate. *See, e.g., United States v. Ferguson*, 942
F. Supp. 2d 1186, 1194 (M.D. Ala. 2013) (Thompson, J.);
*United States v. Flowers*, 946 F. Supp. 2d 1295, 1299
(M.D. Ala. 2013) (Thompson, J.); *United States v. Todd*,
618 F. Supp. 2d 1349, 1353 (M.D. Ala. 2009) (Thompson,
J.).

The Guidelines policy statement on family ties and
responsibilities, § 5H1.6, provides that "family ties and

7

responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6. However, the commentary to § 5H1.6 authorizes a departure "based on loss of caretaking or financial support" in extraordinary cases. *Id.* cmt. n.1. A court deciding whether to grant such a departure must consider, among other things, the "seriousness of the offense," and must find the following four circumstances:

> "(i)    The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
>
> "(ii)    The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.
>
> "(iii)   The loss of caretaking or financial support is one for which no effective remedial

8

or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

"(iv)   The departure effectively will address the loss of caretaking or financial support."

*Id.* cmt. n.1(B).[1]


### B.

Applying the above principles, the court finds that Dantzler committed very serious offenses.  She defrauded the government by using false information to obtain loans and grants from pandemic-relief programs.  Her guilty plea related to an application for an Economic Injury

---

1. **Though Dantzler did not request a departure under this provision, the court considered granting her a departure under this provision and exercised its discretion not to do so.**  But, in the absence of the variance granted, the court would then have departed downward so as to impose the same sentence imposed today.

Disaster Loan that contained false information about the applicant organization's date of establishment, number of employees, revenues, and sales. After receiving a loan of $ 48,000 for the organization, she laundered the funds by moving them from her bank account to another account. She then used the funds to pay off a home mortgage and her husband's car loan. But her relevant conduct went well beyond that. She also submitted fraudulent loan and grant applications on behalf of a legitimate non-profit organization she had founded and for family and friends in Mississippi. She falsified the number of employees and payroll of organizations to increase the amount of funds they would receive, and exchanged false "payroll checks" in an effort to hide the fraud. She also received "consulting fees" from individuals associated with organizations she assisted. She used the proceeds of the fraud to buy multiple residential properties, with the intent of renting them

10

out as low-income housing. She obtained a total of approximately $ 927,338.47 in pandemic-relief funds for the organizations associated with her or her husband based on fraudulent applications. In addition, the others she assisted in submitting fraudulent applications resulted in another $ 1,049,864 in fraudulent pandemic-relief loans. In short, she committed frauds approaching a total of two million dollars.

Her offenses, therefore, resulted in a very significant loss to the government and taxpayers.[2] Given the size of the loss, a sentence of incarceration is warranted for both deterrence and punishment. Also, there is the important factor of fairness to others who have committed fraudulent offenses of similar enormity and circumstances and who would, in general, likely have

---

2. There is no indication that her offense involved her children or placed her children or family in danger of violence. However, it appears that some of her adult relatives and her husband might have been involved.

received or would be looking at significant sentences as well.

### C.

The other significant factor the court must consider is the impact of a Guidelines sentence on Dantzler's children.  The court has before it the testimony of Dr. Tyler Whitney and the supplemental declarations under penalty of perjury submitted by Whitney and Dantzler's soon-to-be ex-husband.  Dantzler, who is the process of a divorce, lives alone with her four children who are ages one, three, five, and 11.  She homeschools the oldest two children, both of whom have been diagnosed with autism.  The three-year old has also been diagnosed with a developmental disability that resembles autism.  Dantzler is nursing the one-year-old.

Dantzler's 11-year-old, C., has autism spectrum disorder with level-two support needs, as well as

12

intellectual disability.[3]  His developmental age is half
to a third lower than his chronological age of 11, but
he is tall for his age, weighs approximately 200 pounds,
and looks like a teenager.  He lacks impulse control and
self-regulation and has a low frustration tolerance.  He
does not understand "if-then thinking."  If he wants
something, he continues to ask for it and becomes

---

3. There are three support levels in people with
autism.  Level one support is for people with very mild
cases, who may simply need some assistance with certain
social interaction skills. People with level-two support
needs cannot work or complete assigned tasks
independently at home or at school.   They often leave
the task they are working on, whether it be eating
breakfast, getting dressed, or schoolwork.  They are
easily distracted by things that would not distract
people without the condition, due to their unique
perception.  They need a familiar person and a familiar
environment in order to learn, and if either of these is
not present, it is very difficult for them to be taught
or learn.  Their behavior is socially inappropriate, and
they push for their needs to be met regardless of the
circumstances.  A person with level-three support needs
often has no language ability or no viable language and
requires 24-hour visual supervision.

increasingly frustrated and dysregulated until he gets what he wants. When he is dysregulated, he uses a loud and commanding voice and engages in quick, unpredictable, agitated movements. His language breaks down and he engages in ritualistic and repetitive language.

As Whitney testified, when there is disruption in their routine, children with autism become dysregulated and are not able to calm themselves. Children with autism have a primary "person." If there is a disruption in their routine, they look for "their person" to make sense of that disruption. If their person is removed for a significant period of time, they can lose skills that they have gained in the past, such as toileting, and can begin escaping or acting out aggressively. The extent and permanence of the damage depends in part on the child's unique characteristics, age, and whether they are in a critical developmental period.

14

Dantzler is C.'s "person," and he relies on her to make sense of the world and for his sense of security. He has a very difficult time being separated from his mother. When she showers, he sits outside the bathroom door knocking and saying "Mom" to reassure himself that she is in there.

When he attended public school previously, he was bullied and came home with "marks" on him. Dantzler was unsatisfied with the explanations she received from the school and felt school staff could not guarantee his safety, so she began homeschooling him, using an online academy for curriculum. According to Dr. Whitney, C. requires "hand over hand," or one-on-one, teaching to provide constant reminders of what he needs to do. Educating C. takes a very in-depth knowledge of what he can tolerate and what he cannot, because if pushed too hard, he may shut down or have a meltdown. Dantzler has obtained the training necessary to do so.

15

Dantzler has educated herself extensively about autism. She took C. to specialists to be diagnosed when local doctors initially minimized his symptoms, and she arranged for him to receive early intervention plans, occupational therapy, social skills training, and applied behavior analysis.

Dr. Whitney opined that Dantzler's caretaking of C is "irreplaceable." Were Dantzler taken out of his life, the transition for him would likely be "incredibly rough" with a noticeable increase in his autism behaviors, and the damage he would likely suffer would be permanent because the important developmental window he is currently in would have passed. Whitney testified that he would expect to see a "dramatic and severe" impact on C. if Dantzler were incarcerated, including "profound decompensation" of skills he has learned and regression in behavior. Given C.'s size, Whitney also expressed concern that he could become physically destructive. And

16

he expected damage to C. regardless of the length of
incarceration.

Dantzler's second oldest child, A., who is five years
old, also has autism with level-two support needs, as
well as attention deficit disorder, combined type.  A.
has a delayed understanding of personal space and is very
distractable and impulsive.  A. constantly makes noise,
pushes boundaries, and engages in risky activity such as
climbing and jumping from one piece of furniture to
another if not stopped from doing so, and has a tendency
to elope, or run away.  Dantzler has enrolled A. in an
electronic-monitoring program for individuals who tend
to elope, which allows local law enforcement to locate
them if necessary.  Dantzler has been homeschooling A.
as well.  Dantzler arranged for him to receive early
intervention plans, occupational therapy, social skills
building, and applied behavior analysis, and he continues
to need the last three.  Dr. Whitney opined that

17

Dantzler's care of A. is irreplaceable, and that A. is likely to experience regression in his behavior and may shut down to learning if she is incarcerated. However, he felt it likely that A. could overcome losses over time due to his age, unlike C.

Dantzler's third child, L., who is three years old, has been diagnosed with developmental delays. She has symptoms similar to autism spectrum disorder, including disturbance of skin sensation, atypical sensory responding, and speech-language issues. According to Dr. Whitney, it is possible that L. will be diagnosed with autism in the future, and he noted that it is quite difficult to diagnose autism in young girls. He believes the child would have a difficult time with Dantzler being sent to prison because she has imprinted on Dantzler. L. is in a window of opportunity for growth that "quite possibly" would be lost, causing permanent damage to the child.

Overall, while Dr. Whitney predicted the impact on the three children of Dantzler's being taken out of their lives would be "devastating," her absence would not be devastating no matter the extent of that absence.  For example, Whitney explained that, as to C., "[I] can't speak to any amount of time precisely," and then went on to explain that "her being away from him even for a day would cause difficulty for C," that his mother "being gone say 12 months" would cause a "lot of difficulty," and that "5 years" would cause "Five times the difficulty."  In short, the extent of the negative impact of her absence on each of her children depends on the length of that absence.

Dantzler's soon-to-be ex-husband is not able to replace her.  He works full-time at a 'warehouse club' store driving a forklift and stocking shelves; he cannot homeschool the children or care for the two youngest during the day.  Even if he were to send the two older

19

children back to public school and the two youngest to daycare, he does not remain alone with the children for more than a couple of hours, and his current role is limited to driving them to and from treatment and visiting with them in Dantzler's home. Dantzler is the parent who has cared for the children and knows how to provide the specialized care needed for their disabilities. When they are with their father, the older children constantly ask when their mother will be back. The father does not understand the children's diagnoses or the proper treatment, has not educated himself or attended any trainings about autism, and says he has tried to read the paperwork about his children's autism but does not understand it. After interviewing him, Dr. Whitney opined that the father "is NOT capable of providing independent care for this children 'C', age 11,

'A', age 5, and 'L', age 3."  Whitney Suppl. Decl (Doc. 49) at 2.[4]

There are no other relatives who could take care of the children full time.  Dantzler's parents cannot care for the children.  Her mother has lupus and other ailments that prevent her from taking custody of the children, and

_____

4. The government argues that the children's father is capable of caring for the children because the divorce settlement agreement allows him to have custody of the children over weekends and certain vacations.  However, as the father has never taken sole custody of the children for a weekend or holiday, the court does not view the agreement as significant evidence of his capability to care for the children alone for a lengthy period of time.

Nevertheless, the court does not want to be understood as relieving Danzler's husband from all responsibility for his children or sanctioning his current conduct towards his children.  The children are his, and he is responsible for them.  The record does not reflect that he cannot still obtain training and experience in caring for them on his own, and to make arrangements with his employer and for school and daycare as needed.  To the extent he still does not personally step up to help Dantzler care for them, he should still be held accountable for arranging for someone else to help Dantzler do so.

she does not understand how to care for the three children with disabilities. Dantzler's father is a commercial truck driver who cannot stay home with the children. Her parents also live in Mississippi, hours away from Alabama where the children reside, so they are not easily available to assist the children's father. Dantzler's sister lives in Georgia and is unwilling to take the children.

### D.

In determining whether to vary from a Guidelines sentence of 57-71 months, the court is essentially confronted with two opposing sets of considerations.[5] On

---

5. The Probation Department orally informed the court that defendants typically serve about 85 % of a sentence of a year and a day or more. Realistically, therefore, the court believes that, absent a variance, Dantzler would likely serve 48-to49 months, for the court would, absent a variance, impose a bottom-of-the-Guidelines sentence of 57 months and it is highly likely that she would be a model prisoner, without infractions.

the one hand, for the reasons already given, the offenses that Dantzler committed clearly justify a significant period of incarceration. On the other hand, a Guidelines sentence will significantly affect Dantzler's children, and, in particular, C.

As to the first set of considerations, Dantzler's offenses resulted, as stated, in a substantial loss to the government and taxpayers: nearly two million dollars. And there is also the important factor of fairness to others who have committed fraudulent offenses of similar enormity and with similar circumstances and who would, in general, likely have received or would be looking at significant sentences as well. Moreover, the law could not be that, no matter what offense Dantzler committed (one that involves multimillions of dollars or even a violent one), the circumstances of her children would always trump. She cannot live <u>completely</u> outside the consequences of her actions, no matter how serious,

23

merely because of the circumstances of her children. Indeed, § 5H1.6 provides that an important factor for the court to consider is the "seriousness of the offense." There must be a point where the nature of one's conduct warrants incarceration of some length despite the impact on one's family.

Dantzler's counsel explains that "Dantzler committed these offenses in part to acquire income to support her work as a stay-at-home mother taking care of her special needs children." This may have been the basis for initiating her fraudulent scheme, but this reason does not justify stealing almost two million dollars. Greed was still a motivating factor behind her conduct.[6]

_____

6. Defense counsel writes that: "Nor do high guidelines prohibit departures to probation or accounting for family circumstances. Undersigned counsel spoke with Allison Bruning of the Sentencing Resource Counsel with the Defender Services organization. Ms. Bruning examined data from the U.S. Sentencing Commission for 2019 to 2023, for cases sentenced under U.S.S.G. § 2B1.1 (as in this case), with a minimum guideline at or above 57 months

However, the court also concludes that a sentence within the guideline range "would cause a substantial, direct, and specific loss of essential caretaking" to Dantzler's children.  U.S.S.G. § 5H1.6 cmt. n.1(B)(i). Dantzler is the children's caretaker, and, particularly as to C., she is his "person," and lengthy withdrawal of

────────────────────

(as in this case).  There were at least 258 cases in that data set that received probation, or a time served sentence.  At least 90 of those cases included a reference to 'family circumstances' as a basis for the court's decision."  This evidence, while possibly relevant, is insufficient here.  Defense counsel does not indicate how many cases were in the universe of cases considered.  It is 328 cases out of how many cases?  Is therefore only a fraction of a percent reflected here, or only 1 % or 10 % or 20%?  Also, defense counsel does not indicate whether these cases involved "substantial cooperation."  And, finally, defense counsel relies on § 2B1.1, but Dantzler was ultimately sentenced pursuant to U.S.S.G. § 2S1.1, and defense counsel does not indicate whether this makes a difference.

Moreover, it should be noted that it would have been much more beneficial if such sentencing data had been presented in a manner that would have allowed the court (and government counsel) to examine the data itself, pose questions about the data, and have those questions answered.

her care will result in serious harm to C. and quite possibly to the other children as well.

Moreover, the loss of Dantzler's caretaking would "substantially exceed[] the harm ordinarily incident to incarceration for a similarly situated defendant." U.S.S.G. § 5H1.6 cmt. n.1(B)(ii). A sentence of incarceration within the Guidelines range likely would do "dramatic and severe" damage to Dantzler's oldest child in particular. Due to his autism and intellectual disability, the impact of his mother's incarceration on C. would be far worse than the impact of the loss of a parent on a child without his disabilities. An ordinary child would experience the loss of love, care, guidance, and support, but those things could be provided by other adults. Children without C.'s disabilities can form attachments to multiple adults in their lives. They can develop close relationships with parents, siblings, grandparents, relatives, and friends. A grandparent,

aunt, or foster parent can step into a parental role and provide love, care, guidance, and support to a non-autistic child just as well as the parent can. A non-autistic child may be traumatized by the parent's incarceration, but other adults can try to make up for the loss and can be successful at doing so. Moreover, based on the court's general knowledge, a non-autistic child could attend widely available therapy to address the loss of the parent. But the impact on C. of the extended destruction of his routine and the loss of his "person" would likely be severe and permanent, causing a loss of learning and development that likely could not be overcome. This is far worse than the impact on a non-autistic child.

Moreover, Dantzler's caretaking is "irreplaceable" to C. U.S.S.G. § 5H1.6 cmt. n.1(B)(iii). She is C.'s "person," and no one can replace her in that role. Moreover, the children's father lacks the training and

knowledge to provide the care C. and the other children need, and has allowed Dantzler to carry the load of childcare almost singlehandedly. Dantzler's parents cannot handle the children, and her sister is unwilling or unable to do so.

Nevertheless, as stated, while the impact of Dantzler's being taken out of her children's lives would be "devastating," her absence would not be devastating no matter the extent of that absence. The extent of the negative impact of her absence on their lives depends on the length of that absence. Moreover, even absent imprisonment, Dantzler would still need to be prepared for the reasonable possibility that she will be absent, or unavailable to her children, for an appreciable length of time (days, weeks, or even months) due to illness or other unavoidable and unfortunate circumstances that attend one's life.

Courts, including this one, have repeatedly recognized that a variance may be appropriate after weighing all circumstances, including the impact the loss of the defendant caretaker would have on ill family members. *See, e.g.*, *United States v. Spero*, 382 F.3d 803, 804 (8th Cir. 2004) (upholding 'departure' to probation based on defendant's caretaking role in life of child with developmental disability being indispensable); *United States v. Lehmann*, 513 F.3d 805, 806 (8th Cir. 2008) (upholding 'departure' to probation to minimize impact of parent's incarceration on the child with Asperger's disorder, ADHD, and post-traumatic stress disorder); *United States v. Gooch*, No. 2:20CRcr5-MHT, 2022 WL 1747334 (M.D. Ala. May 31, 2022) (Thompson, J.) (granting 'variance' downward because of impact of Guidelines sentence on defendant's disabled children); *United States v. Minefield*, No. 2:23cr123-MHT, 2024 WL 4227045 (M.D. Ala. Sept. 18, 2024) (Thompson, J.)

(granting 'variance' downward because of impact of Guidelines sentence on defendant's disabled child). With a variance, the choices for the court are not just no-imprisonment (that is, for example, probation) versus 57-71 months. The court has the option of giving less than 57 months. The court also has the option of weekends in jail.

Here, the court finds that a sentence requiring no incarceration at all would be inappropriate. As noted earlier, Dantzler's offense was simply too serious to allow for a sentence of probation, and it is important for deterrence that she serve some time in prison. Society--and Dantzler--must understand that an offense like hers results in jail time. Moreover, incarceration of a parent always harms children, and some harm to the children of defendants is a regrettable but inherent part of incarceration. The court of course recognizes that the potential harm to C. and Dantzler's other children

30

would be far more severe than that ordinary level of harm.  Therefore, the court must take on the extremely difficult task here of striking a balance between the need for punishment and deterrence and the need to minimize harm to C. and the other children.[7]

To balance the need for punishment and deterrence with the need to minimize harm to Dantzler's children, the court will vary downward to the following sentence: one month of incarceration, to be followed by three years of supervised release.  As a condition of supervised release, Dantzler shall also serve one year of weekends in jail.  In addition, to allow her and the children's father to prepare for her absence, the court will postpone the start of her month of incarceration for a

---

7. Indeed, sentencings are always difficult when children are affected.  But this sentencing is extremely difficult because, as discussed earlier, the children affected are significantly disabled.

31

period of time, with the exact amount to be determined at the upcoming hearing.  This delay will allow the children's father to obtain training and experience in caring for the children on his own, and to make arrangements with his employer and for school and daycare as needed.  In addition, Dantzler will be required to pay $ 927,338.47, plus a special assessment of $ 200.

The court finds that the sentence outlined above is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing set forth above.

DONE, this the 21st day of March, 2025.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE